UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ZEV LEWINSON, as Assignee of
SWORDPEN.COM, INC.,

                          Plaintiff,

          -v-

HENRY HOLT AND COMPANY, LLC, KAREN J.
KATZ, and JOHN and/or JANE DOES 1 to 10,

                          Defendants.

Case No. 07-CV-10955 (KMK)

OPINION AND ORDER

Appearances:

Zev Lewinson
Teaneck, New Jersey
*Pro Se Plaintiff*

Robert D. Balin, Esq.
Christoper J. Robinson, Esq.
Davis Wright Tremaine, LLP
New York, New York
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

Plaintiff Zev Lewinson ("Plaintiff" or "Lewinson"), as assignee of SwordPen.com, Inc.

("SwordPen") and appearing pro se, brings this action pursuant to the Copyright Act of 1976, as

amended, 17 U.S.C. § 101 et seq. (the "Copyright Act") for copyright infringement against

Defendants Henry Holt and Company, LLC ("Holt"), Karen J. Katz, and John and/or Jane Does 1

to 10 (collectively "Defendants"), seeking injunctive relief, an accounting, and damages.

Plaintiff alleges that Defendants infringed Plaintiff's copyrighted manuscript for a children's

book.  Defendants move to dismiss the Amended Complaint for failure to state a claim pursuant

to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), or in the alternative, for summary

judgment under Federal Rule of Civil Procedure 56 ("Rule 56").  For the reasons stated herein,

Defendants' motion for summary judgment is granted.

## I.  Background

### A.  Factual Background

The following factual allegations are taken from Plaintiff's Amended Complaint.

SwordPen is a New York publisher of children's books, as well as an owner of the

associated copyrights of some of those books.  (Am. Compl. ¶¶ 3-5.)  Defendant Holt is a New

York publisher of fiction and non-fiction books, under either its imprint or other imprints,

including *Metropolitan Books*, *Times Books*, *Owl Books*, *Picador USA*, and *Books for Young*

*Readers.*  (*Id.* ¶¶ 7-8.)  Defendant Katz is an author and illustrator of children books.  (*Id.* ¶ 10.)

During the summer of 1999, Lewinson authored a manuscript entitled *What Do You Call*

*It?* (the "Registered Work"), which was registered on December 2, 1999 with the U.S. Copyright

Office.  (*Id.* ¶¶ 13-17.)  On or about December 20, 1999, Lewinson sent a certified letter to Holt,

which included a copy of the Registered Work, requesting that Holt consider the Registered

Work for publication.  (*Id.* ¶ 19.)  Sometime before September 2001, Lewinson created an

updated version of the manuscript ("Unregistered Manuscript") and sent it to Holt.  (Pl.'s Mem.

in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") 2.)  The Unregistered Manuscript is not

registered with the U.S. Copyright Office, but Plaintiff has indicated that he is taking steps to

register it.  (Letter from Zev Lewinson to the Court (Sept. 4, 2009).)  In spring 2000, Holt

informed Lewinson that it would not publish the Registered Work.  (Am. Compl. ¶ 20.)

In July 2006, Holt published *Can You Say Peace?* (the "Katz Work"), a children's book

authored by Katz.  (*Id.* ¶ 21.)  Katz stated that the idea and concept of the book was given to her

by Holt.  (*Id*. ¶ 22.)[1]  From July 2006 to the present, the Katz Work has been available for sale to the public.  (*Id*. ¶ 23.)

Plaintiff claims that the Katz Work is substantially similar to and is a derivative of the Registered Work, and therefore that it infringes Plaintiff's copyright in the Registered Work.  (*Id*. ¶¶ 29-35.)  In September 2006, Plaintiff's then-counsel notified Defendants that the publication and sale of the Katz Work was in violation of the copyright in the Registered Work.  (*Id*. ¶ 36.) Lewinson assigned his sole ownership of the copyright to SwordPen on August 1, 2007.  (*Id*. ¶ 5.)  On August 1, 2008, SwordPen assigned to Lewinson its legal rights in the instant matter. (*Id*. ¶ 6.)

### B.  Procedural History

SwordPen was the original plaintiff in this action when it was filed on December 3, 2007. (Compl. ¶ 1.)  At the time, SwordPen was represented by counsel.  (*Id*. 1.)  After Defendants had submitted the instant motion to dismiss, SwordPen's counsel sought the Court's permission to withdraw, which the Court granted on June 25, 2008.  (Dkt. No. 12.)  Thereafter, the Court notified Swordpen, through Lewinson, that a corporation is not permitted to appear pro se or to be represented by an individual acting in a pro se capacity.  (Dkt. No. 13.)  Lewinson sought permission to submit an Amended Complaint in this action naming himself as Plaintiff, on the basis that he owns all of SwordPen as well as the copyrighted manuscript at issue, and he has been assigned all of SwordPen's legal claims.  (Dkt. No. 14.)  Defendants, through counsel, submitted a letter on August 14, 2008 stating that they did not oppose amendment of the

---

[1] An e-mail from Katz to Plaintiff, however, suggests that Katz only got from Holt the idea to call the United Nations for research.  (Pl.'s Opp'n, Ex. F.)

3

Complaint, as long as the copyright was properly assigned to Lewinson.  (Dkt. No. 15.)  On

August 18, 2008, Lewinson submitted a proposed Amended Complaint, substituting himself as

Plaintiff.  (Dkt. No. 28.)  The Court accepted the Amended Complaint for filing on August 11,

2009.  (*Id.*)

In the Amended Complaint, Plaintiff seeks an injunction restraining Defendants and

others from engaging in any further acts in alleged violation of the Copyright Act.  (Am. Compl.

¶¶ 39-41.)  Plaintiff also seeks an accounting of any gains that Defendants made from the alleged

infringement, as well as actual damages for copyright infringement, any profits or gains from the

sale or distribution arising from the infringement, and attorney's fees and costs.  (*Id.* ¶¶ 42-48.)

The Court held oral argument on September 9, 2009.

## II.  Discussion

### A.  Standard of Review

Defendants ask the Court to dismiss this action pursuant to Rule 12(b)(6), or in the

alternative, to grant them summary judgment pursuant to Rule 56, on the grounds that the Katz

Work is not "substantially similar" to the Registered Work, as required to establish liability under

the Copyright Act.[2]  As the Court advised the Parties at oral argument, the Court will consider

---

[2] There is ample authority within the Second Circuit that "a district court may make [the] determination [of substantial similarity] on a motion to dismiss for failure to state a claim under Rule 12(b)(6)" and may review the documents at issue as material "integral to the complaint." *See Blakeman v. Walt Disney Co.*, 613 F. Supp. 2d 288, 298 (E.D.N.Y. 2009) (explaining that "many courts have, after comparing the works at issue, dismissed infringement claims for failure to state a claim where substantial similarity between the works cannot be found" and reviewing cases).  However, some courts have cautioned that the question may be more appropriately determined on summary judgment.  *Compare Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 629 n.1 (S.D.N.Y. 2008) (granting Rule 12(b)(6) motion to dismiss on grounds that two works, which the court deemed incorporated into the complaint by reference, were not substantially similar); *Adams v. Warner Bros. Pictures Network*, No. 05-CV-5211, 2007

4

Defendants' motion as a motion for summary judgment pursuant to Rule 56.[3]  While the Court is

_____

WL 1959022, at *5 (E.D.N.Y. June 29, 2007) (same); *Gal v. Viacom Int'l, Inc.*, 403 F. Supp. 2d 294, 304-05 n.4 (S.D.N.Y. 2005) (same); *and Boyle v. Stephens*, No. 97-CV-1351, 1998 WL 80175, at *6 (S.D.N.Y. Feb. 25, 1998) (same), *with Nicholls v. Tufenkian Import/Export Ventures, Inc.*, No. 04-CV-2110, 2004 WL 1399187, at *3 (S.D.N.Y. June 23, 2004) (noting that "copyright cases are rarely dismissed on a 12(b)(6) motion" and declining to do so); *and Great Am. Fun Corp. v. Hosung N.Y. Trading Inc*., 935 F. Supp. 488, 305-06 (S.D.N.Y. 1996) (noting that where "at least some of the parties' marionettes bear a strong, if not striking similarity," the question of substantial similarity "should be reserved for the trier of the fact – or at least the summary judgment stage").  The Court need not decide the appropriateness of deciding the question of substantial similarity on Rule 12(b)(6) grounds, because the Court will consider this motion pursuant to Rule 56.

   [3] Given Plaintiff's pro se status, it bears noting that Plaintiff has had adequate notice that Defendants' motion would be considered as a motion for summary judgment under Rule 56. Indeed, at oral argument, Plaintiff acknowledged that he always understood that Defendants' motion could be considered one for summary judgment, and that he has had adequate opportunity to respond to this motion, even recognizing that Plaintiff believes discovery should be taken before the motion is decided.  *See Beacon Entm't, Inc. v. Menzies*, 715 F.2d 757, 767 (2d Cir. 1983) ("Notice [that a motion will be considered as a summary judgment motion] is particularly important when a party is proceeding pro se and may be unaware of the consequences of his failure to offer evidence bearing on triable issues."); *Murray v. Williams*, No. 05-CV-9438, 2007 WL 430419, at *4 (S.D.N.Y. Feb. 8, 2007) ("[W]hen a party appears pro se, he is entitled to 'unequivocal notice' of a conversion of a motion to dismiss to into one for summary judgment."). In addition to the Court's notice to the Parties at oral argument that the motion would be considered as a motion for summary judgment, *see Blakeman*, 613 F. Supp. 2d at 293 (converting motion to dismiss to motion for summary judgment after notifying the parties of intent to do so at oral argument), Defendants' motion papers explicitly requested that the motion be considered as a summary judgment motion and included exhibits in support of the motion, *see Metrokane, Inc. v. Wine Enthusiast*, 185 F. Supp. 2d 321, 325 (S.D.N.Y. 2002) (concluding that plaintiff should have reasonably recognized the possibility that motion would be decided as a summary judgment motion where defendant filed a Rule 12(b)(6) motion but asked for summary judgment in the alternative).  Defendants did not submit a Notice to Pro Se Litigants Opposing Motions to Dismiss or for Judgment on the Pleadings Treated as Motions for Summary Judgment, under Local Rule 12.1, or a Notice to Pro Se Litigants Opposing Summary Judgment, under Local Rule 56.2, because Plaintiff was not proceeding pro se when the motion was first submitted (though he was proceeding pro se by the time he submitted his response).  Nevertheless, Plaintiff's clear awareness of Defendants' request for summary judgment is reflected in his response papers, which reference documents outside of the Amended Complaint (Pl.'s Opp'n 1-16), and which include as exhibits documents extrinsic to the Amended Complaint.  *See Rose v. Bethel*, No. 03-CV-1241, 2007 WL 2476389, at *3 n.1 (S.D.N.Y. Aug. 29, 2007) ("Since all parties to the motion [including pro se plaintiffs] have already submitted evidentiary material that goes beyond

mindful that the Parties have not yet commenced discovery, "in the copyright context, when analyzing the issue of substantial similarity based an analysis of the two works," it is not unusual for courts to consider a motion for summary judgment prior to discovery. *Blakeman v. Walt Disney Co.*, 613 F. Supp. 2d 288, 298 (E.D.N.Y. 2009); *see also Mallery v. NBC Universal, Inc.*, No. 07-CV-2250, 2007 WL 4258196, at *2 (S.D.N.Y. Dec. 3, 2007) (granting summary judgment in copyright action prior to discovery); *Flaherty v. Filardi*, 388 F. Supp. 2d 274, 283-84 (S.D.N.Y. 2005) ("[The] argument that it is generally inappropriate to consider a motion for summary judgment before allowing discovery is unavailing [where substantial similarity is at issue] . . . because the Court must resolve [that question] . . . solely by comparing Plaintiff's screenplay and Defendants' finished movie.").

Under Rule 56, summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247 (1986). In determining whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

In applying this standard, the Court is mindful that "[t]he submissions of a pro se party

---

the face of the complaint, I construe the motion as seeking summary judgment . . . ."); *Drew v. Chase Manhattan Bank, N.A.*, No. 95-CV-3133, 1998 WL 430549, at *1 (S.D.N.Y. July 30, 1998) (treating defendants' motion as a motion for summary judgment rather than a motion to dismiss in an action where plaintiff was proceeding pro se, "[b]ecause both parties have submitted affidavits and rely upon materials outside the pleadings").

should be held to 'less stringent standards than formal pleadings drafted by lawyers.'"

*Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 577 (S.D.N.Y. 2008) (quoting

*Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (per curiam)); *see also Salahuddin v. Coughlin*, 999 F.

Supp. 526, 535 (S.D.N.Y. 1998) (recognizing that pro se plaintiffs are to be given "special

latitude on summary judgment motions" (internal quotation marks omitted)).  Courts must read a

pro se litigant's supporting papers liberally, interpreting them "to raise the strongest arguments

that they suggest."  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (internal quotation

marks omitted).  This does not, however, "relieve [P]laintiff of his duty to meet the requirements

necessary to defeat a motion for summary judgment."  *Jorgensen v. Epic/Sony Records*, 351 F.3d

46, 50 (2d Cir. 2003) (internal quotation marks omitted); *see also Monterroso*, 591 F. Supp. 2d at

577 ("[P]roceeding pro se does not otherwise relieve a litigant from the usual requirements of

summary judgment, and a pro se party's bald assertion, unsupported by evidence, is not sufficient

to overcome a motion for summary judgment." (internal quotation marks omitted)).

    B.  Summary of the Works at Issue

    Before the Court proceeds with a discussion of the merits of Plaintiff's claim, the Court

summarizes briefly the works in question.

    1.  The Lewinson Works

    a.  The Registered Work

    The Registered Work is a manuscript of a fourteen-page children's book titled *What Do*

*You Call It?*.  (Aff. of Robert D. Balin, Ex. ("Defs.' Ex.") C (Zev Lewinson, *What Do You Call*

*It?*) (hereinafter "Lewinson I").)[4]  Although the manuscript includes the text of the book, it does not include illustrations.  (*Id*.)  The manuscript does, however, provide a short description of a possible illustration to accompany the text on each page.  (*Id*.)

The text on each page of the Registered Work describes a child from one of the following countries, listed in order:  Mexico, Hungary, the United States, Sweden, Germany, Israel, the Congo, Australia, Ireland, Russia, Japan, Saudi Arabia, and China.  (*Id*.)  The description of where each child is from is accompanied by the phonetic equivalent for the word "pacifier" in the child's native language.  (*Id*.)  Each of the work's first thirteen pages proposes to show an illustration of a child sucking on a pacifier in his or her native country.  (*Id*. at 1-13.)  The following excerpts from the manuscript are illustrative:

> Page 2:  Andrea, from Hung[a]ry, sucks her "Tzumi" while her
> Mother brushes her long hair to get her ready for school.
> (illus. the mother combing her hair while she sucks the paci.)
>
> Page 4:  In Swe[]den, Niles sucks his "Naap" while taking his nap.
> (illus. niles sleeping and counting sheep – who are sucking
> pacifiers – while he takes his nap, and smiles while he dreams).
>
> Page 10:  Ivan calls his pacifier a "Pustyscka."  It's easy for him to
> pronounce because Russian is his native language.
> (have Ivan dressed like a kossak on horse, as he sucks his paci.)

---

[4] Plaintiff contends that "[e]ach page [of the Registered Work] consists of a left page of copy and a right page of (eventual) full illustration," and therefore, the Registered Work is really a twenty-eight page manuscript.  (Pl.'s Opp'n 1.)  However, because nothing on the face of the Registered Work itself indicates that it is intended to be a twenty-eight page manuscript, the Court reads the Registered Work as fourteen pages only.  *See Walker v. Time Life Films, Inc.*, 615 F. Supp. 430, 434 (S.D.N.Y. 1985) ("In determining copyright infringement, the works themselves supersede and control contrary allegations and conclusions, or descriptions of the works as contained in the pleadings.").  Regardless, the result here would be the same even if the Registered Work is deemed to be twenty-eight pages.

Page 11:  Han'ako from Japan, calls hers an "Oshayaburi"!  She
can pronounce it even with one in her mouth!
(illus. an adorable chinese girl saying "I love my oshayaburi" while
one is in her mouth.)

Page 13:  Meanwhile, in China, Tzu-shuang loves sucking his
"Nye-chewey" while sailing on the Yangtze River, as he listens to
ancient Chinese stories from his grandfather.
(have fun!)

(*Id*. at 2, 4, 10-11, 13.)  The text of the last page of the story says "What Do You Call It?" at the

top.  (*Id*. at 14.)  The proposed illustration describes "a globe of the planet earth, with all the

above children standing all over the planet, sucking their pacifiers with [smiling] faces, dressed

in their cultures['] clothes.  [The globe will] have a banner of ribbon with all their flags

encompassing the earth, with a dove at one end."  (*Id*. at 14.)  The story ends with the final

message:  "Paci On Earth."  (*Id*.)

### b.  The Unregistered Manuscript

The Unregistered Manuscript is, in Plaintiff's words, "the . . . same story [as the

Registered Work] with a bit more description."  (Pl.'s Opp'n 4.)  The Unregistered Manuscript is

fifteen pages long, one page longer than the Registered Work, and it is also titled *What Do You*

*Call It?*.  (Defs.' Ex. D (Zev Lewinson, *What Do You Call It?*) (hereinafter "Lewinson II") 1-15.)

Like the Registered Work, the Unregistered Manuscript includes the text of the book, and instead

of illustrations, it includes a short description of a possible illustration to accompany the text on

each page.  (*Id*.)  The Unregistered Manuscript proposes that the work show children sucking

pacifiers in the same countries as those depicted in the Registered Work.  (*Id*. at 1-13.)  The text

of the Unregistered Manuscript also gives the word for "pacifier" in the language native to each

of the countries included in the book.  (*Id*.)  The Unregistered Manuscript includes text that was

not included in the Registered Work, the bulk of which provides additional description about

activities in which each of the depicted children participate in their respective countries.  (*Id*. at

1-15.)  For example, the italicized text in the following excerpts highlights text not included in

the Registered Work:

> Page 4:  In Swe[]den, Niles sucks his "Naap" while taking his nap. *He dreams that he is playing "kurah yomma" (hide and seek) with his friends*.
>
> Page 5:  Simone[], who lives in Germany, *enjoys her "Schnuller" while she plays "fangen shpielen" (tag) with her friends!*
>
> Page 6:  Meanwhile, Irit, who lives in Israel, can't wait to get home from day care to pop "moe-tzaytz" into her mouth.  *Then she'll play "bu-bah" (dolls) and "kadur" (ball) with her "ha-vay-rim" (friends)!*
>
> Page 10:  Ivan calls his pacifier a "Pustyscka."  It's easy for him to pronounce because Russian is his native language.  *Ivan enjoys his pacifier even while playing in the "snieg" (snow).  He finds it even helps to keep his mouth warm!*
>
> Page 11:  Han'ako from Japan, calls hers an "Oshayaburi"!  She can pronounce it, *while she rides her "san-rin-sha" (tricycle)*, even with one in her mouth!

(*Id*. at 4-6, 10-11.)  The Unregistered Manuscript includes similar changes to the textual

descriptions of the other children depicted.

The Unregistered Manuscript also proposes several illustrations that were not proposed in

the Registered Work.  For example, whereas the Mexican child in the Registered Work was to be

depicted "happily sucking a pacifier while she wears a colorful sombrero" (Lewinson I, *supra*, at

1), the Updated Work proposes to depict her "happily sucking a pacifier while she plays with a

doll that is sucking a pacifier" (Lewinson II, *supra*, at 1).  Other changes to proposed illustrations

include, among others, the following:

- the child from Sweden is to be illustrated both "counting sheep – who are sucking pacifiers" and "playing in his dreams with his friends, while he takes a nap, and smiles while he dreams" (*id*. at 4);

- the child from Germany is to be illustrated "playing tag as she sucks her pacifier" (*id*. at 5);

- the child from Australia is to be illustrated "suck[ing] his paci [as he] get[s] ready to toss his plastic boomerang" (*id*. at 8);

- the child from Ireland is to be illustrated playing marbles and jumping rope (*id*. at 9);

- the child from Russia is to be depicted "dressed like a kossak on a make believe broom horse, as he sucks his paci while he gallops in the snow" (*id*. at 10);

- the child from Japan is to be illustrated riding a tricycle (*id*. at 11).

In addition, the Unregistered Manuscript also differently depicts the last two pages of the book. (*Id*. at 14-15.) The Unregistered Manuscript still includes the question "What Do You Call It?" at the top of the page, but it proposes that the illustration underneath this question be "a picture of a crowd of kids['] faces[] from all over the world." (*Id*. at 14.) The Unregistered Manuscript includes an additional, fifteenth page, on which children sucking pacifiers will be depicted around a globe. (*Id*. at 15.) The Unregistered Manuscript, like the Registered Work, ends with the message "Paci on Earth." (*Id*.)

### 2.  The Katz Work

The Katz work is titled *Can You Say Peace?*, and it was written and illustrated by Katz and published by Holt in 2006. (Defs.' Ex. B (Karen Katz, *Can You Say Peace?* 1-27 (Henry Holt LLC) (2006)) (hereinafter "Katz").) After the dedication page, the book begins with a two-

page spread that introduces International Peace Day as a day on which "[c]hildren everywhere will wish for peace, hope for peace, and ask for peace." (*Id*. 1-2.) On the right page of the two-page spread, the text explains that "[a]ll around the world [on International Peace Day], there will be many different ways to say peace." (*Id*.) These two pages include an illustrated border depicting children of different races, each of which is clothed in different cultural garb. (*Id*.)

On the following sets of two-page spreads, Katz introduces eleven children, each of whom is from a different country. (*Id*. at 3-22.) The children who appear in the story are from, in order, India, America, Japan, Australia, Mexico, Iran, Russia, China, France, Ghana, and Bolivia. (*Id*.) On the left-hand page of each spread, Katz presents an illustration of a scene from the child's daily life and names the child and his or her country. (*Id*.) On the right-hand page, the child is shown in portrait format and the word for "peace" is stated in his or her native language, both in anglicized spelling and phonetic equivalent. (*Id*.)

The pages depicting individual children are followed by a two-page spread of illustrated vignettes, accompanied by text that states, "[a]ll around the world, children want to go to school, to walk in their towns and cities, to play outside, and to share food with their families. They want to do all these things and feel safe. No matter how we say it, we all want peace." (*Id*. at 23-24.) The next two-page spread includes the question "Can You Say Peace?" at the top of the work and shows the faces of all the children depicted in the work, saying peace in their own language. (*Id*. at 25-26.) The final page states that the United Nations has declared September 21 the International Day of Peace and explains the concept behind the day. (*Id*. at 27.) Beneath this explanation is an illustration of a globe on which the children depicted in the work stand near their countries, while a dove holding an olive branch flies overhead. (*Id*.) Under the illustration,

the work provides a list of other countries around the world, their word for peace, and a guide to pronunciation.  (*Id.* at 27.)

### C.  Copyright Infringement

Under the Copyright Act, "[c]opyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated."  17 U.S.C. § 102(a).  The Copyright Act "grants copyright owners a bundle of exclusive rights, including the rights to 'reproduce the copyrighted work in copies' and 'to prepare derivative works based upon the copyrighted work.'"  *Castle Rock Entm't, Inc. v. Carol Pub. Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998) (quoting 17 U.S.C. § 106).

"'Copyright infringement is established when the owner of a valid copyright demonstrates unauthorized copying.'"  *Id.* (quoting *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir. 1997)).  "To establish [unauthorized copying constituting] copyright infringement, two elements must be proven:  (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *see also Boisson v. Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir. 2001) ("Copyright infringement is established by proving ownership of a valid copyright and copying of constituent elements of the work that are original." (internal quotation marks omitted)); *Crane v. Poetic Prods. Ltd.*, 593 F. Supp. 2d 585, 590 (S.D.N.Y. 2009) (same).

### 1.  Ownership of a Valid Copyright

For any work created after January 1, 1978, copyright automatically inheres upon the work's creation.  *See* 17 U.S.C. § 102(a) ("Copyright protection subsists, in accordance with this

title, in original works of authorship fixed in any tangible medium of expression . . . ."); 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 7.16[A][1] (2009).  Registration with the United States Copyright Office is not required to obtain copyright protection.  *See* 17 U.S.C. § 408(a) ("At any time during the subsistence of [the copyright], the owner of copyright or of any exclusive right in the work may obtain registration of the copyright . . . .  Such a registration is not a condition of copyright protection.").  However, registration is a jurisdictional precondition for bringing an infringement action in federal court.  *See id.* § 411(a) ("[N]o action for infringement of the copyright in any United States work shall be instituted until registration of the copyright claim has been made in accordance with this title."); *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 116, 122 (2d Cir. 2007) ("[S]ection 411(a)'s registration requirement limits a district court's subject matter jurisdiction to claims arising from registered copyrights only.").

For purposes of this motion, Defendants concede that Plaintiff owns a valid copyright in the Registered Work.  (Mem. in Supp. of Defs.' Mot. to Dismiss ("Defs.' Mem.") 7.)  Defendants argue, however, that Plaintiff is jurisdictionally barred from basing his copyright claim on the Unregistered Manuscript, because unlike the Registered Work, the Unregistered Manuscript was not registered with the U.S. Copyright Office.  (*Id.* 8.)  Plaintiff does not dispute that the Unregistered Manuscript has not been registered, explaining that he was unaware that he was required to register a later version of the Registered Work, which, in his words, "simply . . . added more details to [the] story."  (Pl.'s Opp'n 4.)[5]  For the following reasons, the Court

_____

[5] As noted above, Plaintiff notified the Court by letter on September 4, 2009 that he has recently applied for copyright protection for the Unregistered Manuscript.  (Letter from Zev Lewinson to the Court (Sept. 4, 2009).)  However, merely submitting an application for copyright

concludes that the Unregistered Manuscript is a derivative work that cannot form the basis for Plaintiff's copyright infringement suit.

a.  Derivative Work

A "derivative work" is defined in the Copyright Act as "a work based upon one or more preexisting works, . . . [including a] work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship." 17 U.S.C. § 101.  The Second Circuit has held that for a work to constitute a "derivative work" under Section 103 of the Copyright Act, "[a]ll that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.'"  *Weissmann v. Freeman*, 868 F.2d 1313, 1321 (2d Cir. 1989) (quoting *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 102-03 (2d Cir. 1951)). "While this requires 'a distinguishable variation that is more than merely trivial . . . . [t]he test of originality is concededly a low threshold.'"  *SimplexGrinnell LP v. Integrated Sys. & Power, Inc.* ("*SimplexGrinnell LP II*"), No. 07-CV-2700, 2009 WL 2223692, at *3 (S.D.N.Y. July 27, 2009) (quoting *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 782 (2d Cir. 1994)); *Bus. Mgmt. Int'l, Inc. v. Labyrinth Bus. Solutions, LLC*, No. 05-CV-6738, 2009 WL 790048, at *8-9 (S.D.N.Y. Mar. 24, 2009) ("[T]he requisite level of creativity is extremely low; even a slight

registration is not sufficient to confer subject matter jurisdiction on this Court.  *See DMBJ Prods. v. TMZ TV*, No. 08-CV-6160, 2009 WL 2474190, at *2 (S.D.N.Y. Aug. 11, 2009) ("Plaintiff further alleges that merely applying for registration is sufficient to confer subject matter jurisdiction on this Court.  This argument is entirely without support in law."); *DO Denim, Inc. v. Fried Denim, Inc.*, No. 08-CV-10947, 2009 WL 1731103, at *3 (S.D.N.Y. June 17, 2009) ("The language, 'required for registration,' as used in the phrase, 'the deposit, application, and fee required for registration,' [as found in Section 411(a),] suggests strongly that the deposit, application and fee are *prerequisites* to registration and do not themselves constitute registration." (emphasis in original)).

15

amount will suffice.  The vast majority of works make the grade quite easily." (internal quotation marks omitted)).  All that is required to show originality is that "the work was independently created by the author . . . , and that it possesses at least some minimal degree of creativity.'" *SimplexGrinnell LP II*, 2009 WL 2223692, at *3 (quoting *Merkos L'Inyonei Chinuch, Inc. v. Ostar Sifrei Lubavitch, Inc*., 312 F.3d 94, 97 (2d Cir. 2002) (per curiam)).

Here, the Unregistered Manuscript is not simply a trivial edit of the Registered Work. Plaintiff adds a new page "illustrat[ing] . . . a crowd of 'kids faces' from all over the world." (Lewinson II, *supra*, at 14.)  In addition, the Unregistered Manuscript includes significant textual additions: text has been added to almost every page to describe each child's involvement in a play activity in his or her country and to provide a foreign language term for that play activity in the child's country.  (*Id*. at 1-13.)  Most of the illustrations have also been modified to reflect the textual changes.  (*Id*.)

For example, the first page of the Registered Work states:  "Maria, from Mexico, loves her 'Chupette.' / (illustrate a little girl happily sucking a pacifier while she wears a colorful sombrero)." (Lewinson I, *supra*, at 1.)  In contrast, the first page of the Unregistered Manuscript states:  "Maria, from Mexico, loves her "Chupon."  Even her "moon-yeh-ka" (doll) has one! / (illustrate a little girl happily sucking a pacifier while she plays with a doll that is sucking a pacifier)." (Lewinson II, *supra*, at 1.)  Other revisions are similar in structure.  For example, the fourth page of the Registered Work states:  "In Swe[]den, Niles sucks his "Naap" while taking his nap. / (illus. Miles sleeping and counting sheep – who are sucking pacifiers – while he takes his nap, and smiles while he dreams.)"  (Lewinson I, *supra*, at 4.)  The Unregistered Manuscript states:  "In Sweden, Niles sucks his "Naap" while taking his nap.  He dreams that he is playing

"kurah yomma" (hide and seek) with his friends. / (illus. Niles sleeping and counting sheep –
who are sucking pacifiers – and he is playing in his dreams with his friends, while he takes his
nap, and smiles while he dreams.)."  (Lewinson II, *supra*, at 4.)

These revisions are more than minimal.  They change the Registered Work by adding
descriptive detail and, at least arguably, more educational value by providing more foreign
language terms.  Particularly given the "concededly . . . low threshold" for establishing
originality, the changes made to the Registered Work by the Unregistered Manuscript are
sufficient to render the Unregistered Manuscript a derivative work.  *See SimplexGrinnell LP II*,
2009 WL 2223692, at *3-4 (rejecting argument that modified version of computer program was
not a derivative work where the new version included "numerous changes," including new
computer capabilities, and repair of numerous defects); *Well-Made Toy Mfg. Corp. v. Goffa Int'l
Corp.* ("*Well-Made Toy I*"), 210 F. Supp. 2d 147, 164-65 (E.D.N.Y. 2002) (concluding that a
forty-eight-inch tall version of a copyrighted twenty-inch tall doll was a derivative work because
the changes made to the twenty-inch doll to create the forty-eight inch version "were not trivial"
and were the "product of artistic rather than mechanic skill" (internal quotation marks omitted)),
*aff'd*, 354 F.3d 112 (2d Cir. 2003) ("*Well-Made Toy II*"); *Waldman Pub. Corp. v. Landoll, Inc.*,
43 F.3d 775, 782 (2d Cir. 1994) (explaining that adaptations of existing works are derivative
works); *cf. McCormick v. Cohn*, No. 90-CV-0323, 1992 WL 687291, at *14 (S.D. Cal. July 31,
1992) (concluding that a book was not a derivative work where "[b]eyond minor editing, the
book is simply the workbook in a book, rather than a binder, form").

### b.  Unregistered Derivative Work

In *Well-Made Toy II*, the Second Circuit held that federal courts are jurisdictionally

barred from entertaining a copyright lawsuit based on the alleged infringement of a derivative work not itself registered, but derived from a copyrighted registered work. *See* 354 F.3d at 116. As the Second Circuit explained, 17 U.S.C. § 411(a), which provides that "no civil action for infringement of the copyright in any United States work shall be instituted until . . . registration of the copyright claim has been made in accordance with this title," bars federal courts from exercising jurisdiction over a lawsuit alleging that an unregistered derivative work has been infringed. *See Well-Made Toy II*, 354 F.3d at 116 ("[S]ection 411(a) bar[s] . . . district court[s] from considering whether th[e] copyright [in an unregistered derivative work] ha[s] been infringed . . . ."); *In re Literary Works*, 509 F.3d at 123 ("[T]he existence of a claim based on a registered copyright does not bring within a district court's jurisdiction all related claims stemming from unregistered copyrights."); *SimplexGrinnell LP v. Integrated Sys. & Power, Inc*. ("*SimplexGrinnell I*"), No. 07-CV-2700, 2009 WL 857504, at *14 (S.D.N.Y. Mar. 31, 2009) ("It is firmly established in this Circuit that registration of a claim on an original work does not create subject matter jurisdiction with respect to a suit for infringement of the original's unregistered derivative." (internal quotation marks omitted)). Here, Plaintiff concedes that the Unregistered Manuscript was not registered with the U.S. Copyright Office. (Pl.'s Opp'n 4.) Thus, Plaintiff cannot base his copyright infringement claim on the Unregistered Manuscript because it constitutes an unregistered derivative work.

Nevertheless, Section 411(a) does not bar a plaintiff from pursuing a claim in federal court based on infringement of elements contained in a registered work from which an unregistered work was derived. *See Well-Made Toy II*, 354 F.3d at 116 (explaining that plaintiff could pursue claim based on infringement of registered work); *Jamison Bus. Sys., Inc. v. Unique*

18

*Software Support Corp.*, No. 02-CV-4887, 2005 WL 1262095, at *8 (E.D.N.Y. May 26, 2005)

("While the additions to the program constitute elements of a derivative work, and the modified

versions must be registered as derivative works in order protect the modifications, any original

unmodified source code is entitled to protection as part of the original work registered in 1986.").

In considering such a claim, however, the Court must compare the allegedly infringing work with

the Registered Work, and not with the Unregistered Manuscript.  *See Well-Made Toy II*, 354 F.3d

at 116 (explaining that a court cannot compare the allegedly infringing work with the

unregistered derivative work to determine whether copyright infringement has occurred).

Therefore, in analyzing whether the second element of copyright infringement is met, the Court

will examine whether the original elements of the Registered Work were infringed, without

reference to the Unregistered Manuscript.

### 2.  Copying of Constituent Elements That Are Original

The second element of copyright infringement requires Plaintiff to show that Defendants

"'copied . . . constituent elements of the [Registered Work] that are original.'"  *Boisson*, 273 F.3d

at 267 (quoting *Feist Publ'ns, Inc.*, 499 U.S. at 361); *see also Williams v. Crichton*, 84 F.3d 581,

587 (2d Cir. 1996) ("[T]o prevail, [plaintiff] must show that the [defendants] copied the . . .

[copyrighted] books.").  To meet this standard, Plaintiff must demonstrate the following:

"(1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because

a substantial similarity exists between the defendant's work and the protectible elements of

plaintiff's."  *Fisher-Price, Inc. v. Well-Made Toy Mfg., Corp.*, 25 F.3d 119, 122-23 (2d Cir.

1994) (emphasis in original); *see also Tufenkian Import/Export Ventures, Inc. v. Einstein*

*Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003) ("To demonstrate unauthorized copying, the

19

plaintiff must first 'show that his work was actually copied'; second, he must establish 'substantial similarity' or that 'the copying amounts to an improper or unlawful appropriation.'").

### a.  Actual Copying

"Because direct evidence of [actual] copying is seldom available, a plaintiff may establish copying circumstantially by demonstrating that the person who composed the defendant's work had access to the copyrighted material . . . and that there are similarities between the two works that are probative of copying." *Jorgensen*, 351 F.3d at 51; *see also Blakeman*, 613 F. Supp. 2d at 298 (stating this standard).

While "[c]opyright caselaw has caused considerable confusion by" referring to the second part of this test as requiring "substantial similarity," the Second Circuit has explained that "the term 'probative similarity' should be used when referring to the initial burden of proving copying by establishing access and/or similarities,'" and after a plaintiff shows actual copying, the plaintiff must "then show that the copying was unlawful by establishing 'substantial similarity' between the works at issue." *Repp*, 132 F.3d at 889 n.1; *see also Boisson*, 273 F.3d at 267 (explaining that if access and probative similarity are met, plaintiff must also show substantial similarity to prove illegal copying); *Odegard, Inc. v. Costikyan Classic Carpets, Inc.*, 963 F. Supp. 1328, 1337 (S.D.N.Y. 1997) ("Substantial similarity for the purposes of proving actual copying through circumstantial evidence is different from substantial similarity for the purposes of showing illegal copying.  Thus, courts have referred to substantial similarity, in the context of determining actual copying as probative similarity to distinguish it from the demonstration of substantial similarity needed to prove illegal copying." (internal citation and quotation marks omitted)).  "Probative similarity is a less demanding test than substantial similarity and requires

only that the works are similar enough to support an inference that the defendant copied the plaintiff's work.  Stated somewhat differently, the plaintiff must establish that there are similarities between the two works that would not be expected to arise if the works had been created independently.  In this analysis, a court must examine the entire work, not just the protectible elements." *Blakeman*, 613 F. Supp. 2d at 304 (quoting *Eve of Milady v. Moonlight Design Inc.*, 48 U.S.P.Q.2d 1809, 1812 (S.D.N.Y. 1998) (internal quotation marks and citations omitted)); *see also Ringgold v. Black Entm't Television Inc.*, 126 F.3d 70, 75 (2d Cir. 1997) ("[P]robative similarity[] requires only the fact that the infringing work copies something from the copyrighted work; . . . []substantial similarity[] requires that the copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred.").

Because probative similarity (a less demanding standard than substantial similarity) is necessarily met if substantial similarity is met, "some courts have . . . collapsed the two steps of the test [for actual similarity and for illegal copying], holding that a plaintiff must show (1) [that] the defendant had access to the plaintiff's copyrighted work and (2) that defendant's work is substantially similar to the plaintiff's copyrightable material." *Bus. Mgmt. Int'l, Inc.*, 2009 WL 790048, at *7 n.6 (internal quotation marks omitted); *see also Kregos v. Associated Press*, 3 F.3d 656, 662 (2d Cir. 1993) ("[C]opying is generally established by showing (a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works."); *Flaherty v. Filardi* ("*Flaherty II*"), No. 03-CV-2167, 2009 WL 749570, at *4 (S.D.N.Y. Mar. 20, 2009) (same).

Here, Defendants have conceded for purposes of this motion that they had access to the

Registered Work.  (Defs.' Mem. 10 n.7.)  Therefore, even assuming that Plaintiff could

demonstrate probative similarity, thereby establishing actual copying, the success of Plaintiff's

claim turns upon the second part of the test:  whether the Registered Work and the Katz Work are

substantially similar.  *See Williams*, 84 F.3d at 587 (explaining that where defendants concede

access, the "case . . . turns upon . . . whether, in the eyes of the average lay observer, the . . .

[allegedly infringing] works are substantially similar to the protectible expression in the

[copyrighted] books"); *Blakeman*, 613 F. Supp. 2d at 298 (noting that where the defendants

conceded access "the Court need not address [probative similarity because], even assuming

arguendo that probative similarities do exist between the two works and there was actual

copying, plaintiff's claim [will] fail[] as a matter of law [if] he cannot demonstrate a 'substantial

similarity' between the works").[6]

---

[6] Plaintiff asks the Court to deny summary judgment based in part on his argument that discovery will enable him to establish that Defendants had access to both the Registered Work and the Unregistered Manuscript before the Katz Work was conceived or published.  (Pl.'s Opp'n 6-7; Pl.'s Sur-Reply in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Sur-Reply") 2; Letter from Zev Lewinson to the Court (Sept. 4, 2009); Letter from Zev Lewinson to the Court (Sept. 10, 2009).)  As discussed above, the Unregistered Manuscript cannot form the basis for this copyright infringement action, even if Defendants had access to that manuscript.  Moreover, for Defendants to be liable for copyright infringement based on the Registered Work, Plaintiff is required to demonstrate *both* (a) access to the copyrighted work, and (b) substantial similarity between the works.  *See Kregos*, 3 F.3d at 662.  Therefore, even if Plaintiff could uncover evidence during discovery that Defendants had access to the Registered Work (a point that Defendants concede for purposes of this motion), Defendants cannot be held liable for copyright infringement *unless* substantial similarity between the works is shown.  *See Polsby v. St. Martin's Press, Inc.*, No. 97-CV-690, 1999 WL 225536, at *4 (S.D.N.Y. Apr. 19, 1999) ("Even if plaintiff's allegations were sufficient to establish access, summary judgment would be warranted because plaintiff cannot establish substantial similarity between the protectible elements of plaintiff's and defendants' works."), *aff'd*, 8 Fed. App'x 90 (2d Cir. 2001) (summ. order).  Thus, as stated above, whether summary judgment is warranted in this action turns upon whether the works are substantially similar, a question that requires no additional discovery.  *See Williams*, 84 F.3d at 587; *Blakeman*, 613 F. Supp. 2d at 298.

b.  Substantial Similarity

i.  Legal Standard

Determining whether substantial similarity exists requires courts to engage in a "'detailed examination of the works themselves,'" to determine "whether, in the eyes of the average lay observer, [the allegedly infringing work is] substantially similar to the protectible expression in [the copyrighted work]." *Williams*, 84 F.3d at 583, 587; *see also Crane*, 593 F. Supp. 2d at 591 ("[T]he Court need only compare the two works themselves without having to consider any extrinsic evidence.").  In applying this standard, courts must be mindful that "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected." *Feist Publ'ns, Inc.*,  499 U.S. at 348; *see also Boisson*, 273 F.3d at 268 ("Simply because a work is copyrighted does not mean every element of that work is protected.").  Substantial similarity exists only when "it . . . is protected expression in the earlier work that was copied and . . . the amount that was copied is more than de minimis." *Tufenkian Import/Export Ventures, Inc.*, 338 F.3d at 131.

 "In most cases, the test for 'substantial similarity' is the so-called 'ordinary observer test' which [inquires] . . . whether 'an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.'" *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995) (quoting *Folio Impressions, Inc. v. Byer Cal.*, 937 F.2d 759, 766 (2d Cir. 1991)) (brackets omitted).  When comparing works that contain both protectable and non-protectable elements, courts should apply a "more discerning ordinary observer test" by considering whether there is substantial similarity "between those elements, and only those elements, that provide copyrightability to the allegedly infringed [work]." *Boisson*, 273 F.3d at

272 (quoting *Knitwaves, Inc.*, 71 F.3d at 1002).  In applying this test, "a court is not to dissect the works at issue into separate components and compare only the copyrightable elements."  *Id*. Rather, the Court should "look to the total concept and feel of the protected work and the allegedly infringing work" while also "keeping in mind the distinction between a work's non[-]protectible elements and its selection, coordination, arrangement, and expression of those elements – which are protectible."  *City Merchandise, Inc. v. Broadway Gifts, Inc.*, No. 08-CV-9075, 2009 WL 195941, at *2 (S.D.N.Y. Jan. 27, 2009) (quoting *Eden Toys, Inc. v. Marshall Field & Co.*, 675 F.2d 498, 500 (2d Cir. 1982)) (internal quotation marks omitted); *see also Psihoyos v. Nat'l Geographic Soc'y*, 409 F. Supp. 2d 268, 274 (S.D.N.Y. 2005) ("The discerning ordinary observer inquiry entails not a piecemeal comparison of each of the protectible elements with its putative imitation, but rather a careful assessment of the total concept and feel of the works at issue, after the non-protectible elements have been eliminated from consideration." (internal quotation marks and brackets omitted)).

In the literary context, the "more discerning" approach requires courts to consider "similarities in such aspects as the total concept and feel, theme, characters, plot, sequence, pace, and setting" of two works.  *Boisson*, 273 F.3d at 273 (quoting *Williams*, 84 F.3d at 588).  Where, as here, the works at issue are created for children, greater "[c]onsideration of the total concept and feel of a work, rather than specific inquiry into plot and character development, is [particularly] . . . appropriate . . . because children's works are often less complex than those aimed at an adult audience."  *Williams*, 84 F.3d at 589; *see also Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir. 1976) (explaining that "stories, intended for children, are necessarily less complex than some other works submitted to pattern analysis, [and therefore]

. . . in addition to the essential sequence of events," courts should "consider the total concept and

feel of the works in question." (internal quotation marks omitted)).

When considering substantial similarity, summary judgment is appropriate if "the

similarit[ies] . . . concern[] only 'non-[protectable] elements of the plaintiff's work,' or [if] no

reasonable jury, properly instructed, could find that the two works are substantially similar."

*Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 240 (2d Cir. 1983) (quoting *Hoehling v.*

*Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980)); *see also Gal v. Viacom Int'l,*

*Inc.*, 518 F. Supp. 2d 526, 543 (S.D.N.Y. 2007) ("While similarity is generally a question of fact

for a jury, summary judgment is appropriate on the issue where the similarity concerns only

noncopyrightable elements of plaintiff['s] . . . work or no reasonable trier of fact could find the

works similar to the requisite degree." (internal quotation marks and original ellipses omitted)).

"This assessment 'must be made on a case-by-case basis, as there are no bright-line rules for

what constitutes substantial similarity.'" *Bus. Mgmt. Int'l, Inc.*, 2009 WL 790048, at *7 (quoting

*Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998)).

### ii.  Non-Protectable Elements

#### (A)  Ideas

It is "a principle fundamental to copyright law" that "a copyright does not protect an idea,

but only the expression of an idea." *Williams*, 84 F.3d at 587; *see also* 17 U.S.C. § 102(b) ("In

no case does copyright protection . . . extend to an idea . . . ."); *Feist Publ'ns, Inc.*, 499 U.S. at

344-45 ("The most fundamental axiom of copyright law is that '[n]o author may copyright his

ideas or the facts he narrates.'" (quoting *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471

U.S. 539, 556 (1985))).  Of course, "[t]he distinction between an idea and its expression is an

25

elusive one." *Williams*, 84 F.3d at 587-88; *see also Reyher*, 533 F.2d at 91 ("The difficult task in

an infringement action is to distill the nonprotected idea from protected expression."); *Gal*, 403

F. Supp. 2d at 306 (describing the difference between an idea and its expression as elusive).

"But the nub is that an author must use creativity to transform facts and ideas into an expression

that 'display[s] the stamp of the author's originality.'" *Hudson v. Universal Studios, Inc*., No.

04-CV-6997, 2008 WL 4701488, at *2 (S.D.N.Y. Oct. 23, 2008) (quoting *Harper & Row*, 471

U.S. at 547); *see also Reyher*, 533 F.2d at 91 ("[T]he essence of infringement lies in taking not a

general theme but its particular expression through similarities of treatment, details, scenes,

events and characterization.").  "If the similarity between two works rests solely on a shared

underlying idea, rather than the particular way in which that idea has been portrayed, there is no

substantial similarity." *Hudson*, 2008 WL 4701488, at *2; *see also Gund, Inc. v. Smile Int'l,

Inc*., 691 F. Supp. 642, 645 (E.D.N.Y. 1988) ("[T]o the degree that the similarity between a

copyrighted work and an alleged infringing work inheres only in the general ideas expressed, the

similarities are not infringing.").

Two relevant examples illustrate the distinction between an unprotected idea and

protected expression of an idea.  In *Reyher*, an author of a children's book brought suit against a

children's television network, alleging that the television network aired a skit that infringed on

her copyright.  *See Reyher*, 533 F.2d at 91.  The stories both told the tale of a lost child who

describes his or her mother to a group of strangers as the most beautiful woman in the world.  *See

id*.  After a search for the mother based on this description proves unsuccessful, "a homely

woman," the missing mother, is reunited with her child.  *See id.*  The Second Circuit held that

although both works presented the same "thematic concept that to a lost child, the familiar face

of the mother is the most beautiful face, even though the mother is not, in fact, beautiful to most," this overlapping theme was an unprotectable idea, and the works expressed that idea through different settings, themes, moods, and characterizations.  *Id*. at 92.  Therefore, the court held that "no infringement as to protected expression occurred."  *Id*. at 92-93.

Similarly, in *Williams*, the author of the book series *Dinosaur World* brought suit against the author of *Jurassic Park* for copyright infringement.  *See Williams*, 84 F.3d at 582.  Both works told the story of a small group of individuals, including a knowledgeable adult guide and young dinosaur enthusiasts, visiting a dinosaur zoo.  *See id.*  Each work described an incident in which the characters were chased by carnivorous dinosaurs and escaped, via helicopter, "through the combined wit of the children and adults."  *Id*.  Despite the abstract similarity of these overlapping scenes, the works "prove[d] to be quite dissimilar once examined in any detail."  *Id*. at 590.  There were also "many differences" in the development of the characters "beyond the superficial similarities" such as their age, gender, and the fact that the children were siblings.  *Id*. at 589.  In addition, the characters in *Dinosaur World* were only weakly developed, and "the less developed the characters, the less they can be copyrighted."  *Id*. (quoting *Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930)).  Thus, based on the different ways these works expressed similar ideas, the Second Circuit held that *Dinosaur World* and *Jurassic Park* were not substantially similar as a matter of law.  *See id*. at 92.

### (B)  Scènes à Faire

"Elements subject to the doctrine of scènes à faire are also not protectable."  *Hudson*, 2008 WL 4701488, at *2; *see also Williams*, 84 F.3d at 591 (explaining that a copyright claim will fail where the alleged similarities relate to "unprotectible sc[è]nes [à] faire or trivial,

27

scattered details").  Scènes à faire "[are] incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic."  *Hoehling*, 618 F.2d at 979 (internal quotation marks omitted); *see also MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 194 (2d Cir. 2004) (describing scènes à faire as "elements that follow naturally from a work's theme rather than from an author's creativity"); *Novak v. Nat'l Broad. Co.*, 716 F. Supp. 745, 751 (S.D.N.Y. 1989) ("The Second Circuit has held that sc[è]nes [à] faire are not copyrightable as a matter of law '[b]ecause it is virtually impossible to write about a particular historical era or fictional theme without employing certain 'stock' or standard literary devices.'" (citing *Hoehling*, 618 F.2d at 979)).

For example, in a work about a superhero, scenes that depict the superhero "perform[ing] feats of miraculous strength," wearing a "tight-fitting acrobatic costume[]," battling "wealthy megalomaniacal villains," exercising the "power of self-propelled flight," or leading a double life are all unprotectable scènes à faire.  *See Warner Bros. Inc. v. Am. Broad. Cos.*, 654 F.2d 204, 210 (2d Cir. 1981).  Likewise, "[f]oot chases and the morale problems of policemen, not to mention the familiar figure of the Irish cop, are venerable and often-recurring themes of police fiction[, which] . . . are not copyrightable except to the extent they are given unique – and therefore protectible – expression in an original creation."  *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir. 1986).  Thus, when two works convey similar ideas, the "similarity of events . . . may be considered sc[è]nes [à] faire, which necessarily result from identical situations."  *Reyher*, 533 F.2d at 92; *see also id.* ("[W]here a lost child is the protagonist, there is likely to be a reunion with parents.").

The scènes à faire doctrine also prevents "stock characters" from receiving copyright

protection.  *See Gaiman v. McFarlane*, 360 F.3d 644, 659 (7th Cir. 2004) ("A stock character is a stock example of the operation of the [scènes à faire] doctrine . . . ."); *Walker*, 784 F.2d at 50 (explaining that stock characters are not protectable); *Hoehling*, 618 F.2d at 979 (same); *CK Co. v. Burger King Corp.*, No. 92-CV-1488, 1994 WL 533253, at *4 (S.D.N.Y. Sept. 30, 1994) ("[C]opyright law does not protect stock characters . . . standard in the treatment of a given topic."), *aff'd*, 122 F.3d 1055, 1055 (2d Cir. 1995) (summ. order).  "If a [stock character such as a] drunken old bum were a copyrightable character, so would be a drunken suburban housewife, a gesticulating Frenchman, a fire-breathing dragon, a talking cat, a Prussian officer who wears a monocle and clicks his heels, a masked magician, and, in Learned Hand's memorable paraphrase of Twelfth Night, 'a riotous knight who kept wassail to the discomfort of the household, or a vain and foppish steward who became amorous of his mistress.'  It would be difficult to write successful works of fiction without negotiating for dozens or hundreds of copyright licenses, even though such stereotyped characters are the products not of the creative imagination but of simple observation of the human comedy."  *Gaiman*, 360 F.3d at 660 (quoting *Nichols*, 45 F.2d at 121-22) (internal citations omitted).

<u>(C)  Titles, Words, or Ordinary Phrases</u>

Finally, "it is axiomatic that words, short phrases, titles, and slogans are not subject to copyright, even if they can be trademarked."  *Moody v. Morris*, 608 F. Supp. 2d 575, 579 (S.D.N.Y. 2009); *see also Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1072 (2d Cir. 1992) ("[T]he ordinary phrase may be quoted without fear of infringement." (internal quotation marks omitted)); *Ventures Educ. Sys. Corp. v. Prof'l Dev. Assocs., Inc.*, No. 07-CV-223, 2008 WL 3166667, at *3 (S.D.N.Y. July 31, 2008) ("There is . . . no copyright protection for titles, words,

or ordinary phrases."); *Bell v. Blaze Magazine*, No. 99-CV-12342, 2001 WL 262718, at *4

(S.D.N.Y. Mar. 16, 2001) (same); *cf.* 37 C.F.R. § 202.1(a) (prohibiting registration of "[w]ords

and short phrases such as names, titles and slogans" for copyright protection).  With respect to

titles in particular, "[o]wning the copyright on a work[] 'does not carry with it the exclusive right

to use of the title on any other work,'" but rather, "'the only legal protection for literary titles lies

in the field of trademarks and unfair competition." *Apollo Theater Found., Inc. v. Western Int'l*

*Syndication*, No. 02-CV-10037, 2005 WL 1041141, at *16 n.13 (S.D.N.Y. May 5, 2005); *see*

*also* 2 McCarthy on Trademarks & Unfair Competition § 10:34 (4th ed. 2009) (explaining that

"[a] copyright on a literary work does not carry with it the exclusive right to use of the title on

any other work").

  With respect to the copying of "short phrases," the Second Circuit has held that "'the

"ordinary" phrase may be quoted without fear of infringement.'"  *Arica*, 970 F.2d at 1072-73

(quoting *Salinger v. Random House, Inc*., 811 F.2d 90, 98 (2d Cir. 1987)).  However, a

defendant's copying of a phrase is actionable if the phrase amounts to a "'sequence of thoughts,

choice of words, emphasis, and arrangement to satisfy the minimal threshold of required

creativity,'" or if the copier has "quote[d] or paraphrase[d a] sequence of creative expression that

includes . . . a[n ordinary] phrase.'"  *Id*. at 1073 (quoting *Salinger*, 811 F.2d at 98).  Where a

copier does not word-for-word quote from a protected sequence of creative expression, she may

still be held liable for infringement if the plaintiff can establish "comprehensive non-literal

similarity" between the works, by showing that the copier "has . . . appropriated the 'fundamental

essence or structure' of plaintiff's work."  *Id*. at 1073.

c.  Application

Plaintiff asserts that the Registered Work and the Katz Work share the following

elements:  (1) the titles, and "main questions," of both stories are similar (i.e., *What Do You Call*

*It?* and *Can You Say Peace?*) (Pl.'s Opp'n 2, 13); (2) the theme of both works is the desire of all

children worldwide for peace (*id*. 5); (3) both works portray children from various countries

"wishing for peace in their native tongues" (*id*. 10; Pl.'s Sur-Reply 3); (4) both books are (or

propose to be) illustrated with depictions of "children playing, or in familiar settings" of their

native country (Pl.'s Opp'n 10); (5) both books depict a Chinese child sitting near an elderly

person on or near a river (*id*.); (6) both books depict children getting ready for school (*id*. 13); (7)

both books place the main question of the works near or at the end of the works (*id*.); and (8) the

end of both works are (or propose to be) illustrated with a globe with the children depicted in the

works standing around the planet, along with a dove holding an olive branch (*id*. 14; Pl.'s Sur-

Reply 4).[7]

To determine whether the works are substantially similar, the Court examines the

similarities in such aspects as the theme, plot, characters, sequence, setting, and total concept and

---

[7] Many of Plaintiff's arguments concern similarities between the Katz Work and the
Unregistered Manuscript.  For example, Plaintiff argues that (1) the works both place their main
questions on the penultimate page (Pl.'s Opp'n 14), (2) the works both include a "roll call" page
of "kid faces" from around the world (*id*.), (3) both works include depictions of children playing
hide and seek together with a depiction of a child taking a nap (*id*. 13), (4) both works depict a
boy from Russia playing in the snow (*id*.), and (5) the Unregistered Manuscript depicts a child
from Japan riding a tricycle and the Katz Work depicts a child from Japan riding a bicycle (*id*.).
For the reasons discussed above, *see supra* Section II.C.1.b, however, the Court cannot consider
the Unregistered Manuscript in considering Plaintiff's copyright infringement claim.  The Court
therefore lists only similarities that Plaintiff asserts exist between the Registered Work and the
Katz Work.  However, it bears noting that the Unregistered Manuscript, even with the many
differences from the Registered Work, uses the same metaphorical approach to its topic, which
is, as discussed below, a principal distinction between the Registered Work and the Katz Work.

31

feel of the two works.  Having carefully considered Plaintiff's arguments and reviewed the

Registered Work and the Katz Work, the Court concludes that any similarities between the works

concern only non-copyrightable elements of Plaintiff's work and that no rational trier of fact

could find that the works are substantially similar.

i.  Titles/Main Questions

As a threshold matter, the Court rejects Plaintiff's argument that the title-questions of the

two works support his claim of copyright infringement.  Plaintiff cannot base his copyright

infringement claim on the alleged similarity between the title-questions of the works at issue (i.e.,

*How Do You Say It?* and *Can You Say Peace?*), based either on the use of these questions in the

works' titles or in their text.  As discussed above, the title of a work cannot form the basis for a

copyright infringement claim.  *See Bell*, 2001 WL 262718, at *4 (holding that copyright

infringement claim could not be based upon similar titles *Hip Hop Behind Bars* and *Hip Hop*

*Behind the Walls*).

Plaintiff also cannot base his claim on the alleged similarity between the question "Can

You Say Peace?," as it is used in the Katz Work, and the question "What Do You Call It?," as it

is used in the Registered Work.  There is nothing so distinctive about the Registered Work's use

of the phrase "What Do You Call It?" that warrants departure from the general rule that short

phrases are not subject to copyright.  *Moody*, 608 F. Supp. 2d at 579 ("There is no question . . .

that the . . . phrase 'Where Words Come Alive' cannot support a claim for copyright

infringement."); *Dobson v. NBA Props., Inc.*, No. 98-CV-7696, 1999 WL 97901, at *2 (S.D.N.Y.

Feb. 24, 1999) (holding that plaintiff did not have a copyright "in the slogan 'Repeat

Threepeat'").  Simply put, the Registered Work's question "What Do You Call It?" is not so

32

original in its "sequence, choice of words, emphasis, or arrangement" to qualify as more than an "ordinary" phrase. *Arica*, 970 F.2d at 1072-73. Nor has the Katz Work quoted or paraphrased "[a longer] sequence of creative expression that includes" the question "What Do You Call It?". *Id.*; *see also id.* ("'[A] copier may not quote or paraphrase [a] sequence of creative expression that includes [an ordinary phrase].'" (quoting *Salinger*, 811 F.2d at 98)).

Finally, the two questions are not substantially similar. The question "How Do You Say Peace?" in the Katz Work is not a "word-for-word" copy of the Registered Work's question "What Do You Call It?". While the doctrine of "comprehensive non-literal similarity" holds that copyright infringement can occur in the absence of word-for-word similarity when the "defendant has . . . appropriated the 'fundamental essence or structure' of plaintiff's work," *see id.*, the question "How Do You Say Peace?" does not "appropriate the 'fundamental essence or structure'" of the question "What Do You Call It?," particularly given that the questions do not facially refer to the same subject. Indeed, as discussed below, the two titles do not, on their face, convey the same message. Plaintiff's title, read together with the text, asks about the words used by children from different countries to refer to their pacifiers. Defendants' title refers to the different words used around the world to refer to peace. To the extent Plaintiff's use of the pacifier (or "paci") is a metaphor for peace, an assertion the Court is willing to accept for purposes of this motion, that difference alone explains why there is no substantial similarity in the titles (or the works).[8]

---

[8] On this point, it bears noting that the word "peace" appears nowhere within the text of the Registered Work, and the phrase "Paci on Earth" only appears on the last page of the Registered Work, below the question "What Do You Call It?" and below the depiction of the globe. (Lewinson I, *supra*, at 14.)

ii.  Theme

The theme of the Katz Work is that, while children around the world express the word "peace" differently, all children share in common their desire to live in peace.  From the Court's review of the Registered Work, one reading of its theme is that while children around the world express the word pacifier differently, all children share in common their love of the pacifier. Plaintiff argues, however, that the centrality of the "pacifier" to the Registered Work was a creative means of conveying the sentiment that all children desire world peace through portrayal of "the peaceful feeling children receive from their pacifier."  (Pl.'s Opp'n 5.)  Plaintiff claims that the final message of the Registered Work, which reads "Paci on Earth," is a metaphorical "wish and prayer" for peace (and not, as Defendants have portrayed it, a clever play on words intended to convey the universal love of the pacifier).  (*Id*.)

One could question whether a reasonable person would read into the Registered Work such a nuanced theme, particularly given Plaintiff's own statement that the Registered Work is "geared to toddlers."  (*Id*. 4.)  Nevertheless, accepting *arguendo* Plaintiff's claim that the theme of the Registered Work is the desire children share throughout the world for peace, both this overlapping theme and the portrayal of children from various countries saying the same word in their native language are unprotectable ideas.  *See Williams*, 84 F.3d at 589 (adventure book with theme of modern-day children visiting park where ancient dinosaurs run free is an unprotectable idea); *Reyher*, 533 F.2d at 91 (explaining that while both works presented the same "thematic concept that to a lost child, the familiar face of the mother is the most beautiful face, even though the mother is not, in fact, beautiful to most," this overlapping theme was an unprotectable idea); *Hudson*, 2008 WL 4701488, at *2 (concluding that works' shared themes involving prison life

34

and wrongful incarceration were not protectable); *Robinson v. Viacom Int'l, Inc.*, No. 93-CV-2539, 1995 WL 417076, at *10 (S.D.N.Y. July 13, 1995) ("The broad theme of a 1950's era sitcom family interacting with a contemporary family is an unprotectible idea."); *CK Co.*, 1994 WL 533253, at *9 ("[T]he broad theme of a diverse group of children sharing adventures and experiences is by itself unprotectable under the copyright laws.").

Copyright law protects the "*expression* [of ideas] that 'display the stamp of the author's originality,'" *Hudson*, 2008 WL 4701488, at *2 (quoting *Harper & Row*, 471 U.S. at 547) (emphasis added), however the Registered Work and the Katz Work differently express the theme that all children desire world peace.  The protectable aspect of Plaintiff's Registered Work is not the idea that children worldwide desire peace, but rather his expression of that idea through the metaphor of the pacifier.  *See CMM Cable Rep., Inc. v. Ocean Coast Props., Inc.*, 888 F. Supp. 192, 197 (D. Me. 1995) (explaining that while the "idea" to have a radio contest with a jackpot that accumulates hourly was not protectable, the expression of that idea through the metaphor "of hourly employment" would be protectable if sufficiently original).  As Plaintiff acknowledges, the Registered Work relies on "the metaphor of a pacifier and . . . children's names for it all around the globe [to] convey[] . . . [its] message that children worldwide desire peace."  (Pl.'s Opp'n 5.)  Plaintiff's own words on this point are telling:  "The creativity of [Plaintiff's] idea was to substitute the peaceful feeling children receive from their pacifier and to integrate 'paci' and 'peace' as the surprise ending at the end of the story."  (*Id*.)  On the other hand, the Katz Work does not copy Plaintiff's creativity, instead conveying the same message as the Registered Work without relying on metaphor.  *See generally Dymow v. Bolton*, 11 F.2d 690, 691 (2d Cir. 1926) ("If one compares two dramatic compositions, whether in forms suitable for

35

the stage or for the library, what has been called the 'fundamental plot,' the 'same old plot,' or an 'old story,' can assume any author's dressing or adornment; that author can devise and use his own way of expressing that plot, and he will not infringe.").  As the Katz Work plainly puts it: "Children everywhere will wish for peace, hope for peace, and ask for peace."  (Katz, *supra*, at 7.)  Thus, the means of each author in expressing the arguably overlapping theme differ substantially.

### iii.  Plot

Neither of the works at issue here is a plot-driven work that portrays a sequence of events. Rather, both works convey their themes through the use of discrete, simple scenes, the text of which provides a foreign language term.  Nevertheless, to the extent these simple scenes constitute part of the works' plot, these works are not substantially similar in their plots.  *See Cavalier v. Random House, Inc.*, 297 F.3d 815, 824 (9th Cir. 2002) (suggesting dissimilarity where two children's books did not share "any detailed sequence of events," in part because one of the books simply "describe[d] a simple, discrete group of scenes").

On the most general level, both works depict discrete scenes of children engaged in various activities in different countries throughout the world, however, the depiction of children from around the globe is an "indispensable, or at least standard" method of conveying the idea that children around the world share things in common, *see Hoehling*, 618 F.2d at 979 (internal quotation marks omitted).  (Defs.' Exs. E (Barnabas Kindersley & Anabel Kindersley, *Children Just Like Me* (DK Publishing) (1st ed. 1995)), G (Beatrice Hollyer, *Wake Up, World!  A Day in the Life of Children Around the World* (Henry Holt & Co. LLC) (1999)), I (Donata Montanari, *Children Around the World* (Kids Can Press) (2001), K (V. Radunsky, *What Does Peace Feel*

36

*Like?* (Simon Says Kids) (2004)).)  That two works share in common such a general plot feature does not render them substantially similar.  Indeed, courts have held the substantial similarity requirement not met in cases involving works with far greater similarities in plot.  *See Williams*, 84 F.3d at 589 (concluding that works portraying an adult guide and two young dinosaur enthusiasts visiting a dinosaur zoo were not substantially similar despite some plot similarities); *Reyher*, 533 F.2d at 92 (concluding that two works were not substantially similar despite depiction in both works of a child, separated from its mother, describing its mother as "the most beautiful woman in the world," explaining that the "similarity of events . . . may be considered sc[è]nes [à] faire, which necessarily result from identical situations"); *Madrid v. Chronicle Books*, 209 F. Supp. 2d 1227, 1242 (D. Wyo. 2002) (holding that works were not substantially similar despite shared plot element of children encountering monsters in their closets because the "snapshot of a monster encountering a child in a closet is . . . standard and indispensable with [a depiction of children and monsters]").

Nor are there specific protectable scenes within the two works that overlap.  Plaintiff argues that three scenes of each work are similar:  (1) both books depict a Chinese child sitting near an elderly person together with a river (Pl.'s Opp'n 13); (2) both books depict children getting ready for school (*id.*); and (3) both books end with an illustration of the children depicted in the works standing around the planet, along with a dove flying overhead (*id.* 14; Pl.'s Sur-Reply 4).  However, based on the Court's review of the two works, the protectable elements of these scenes are not sufficiently similar to enable a reasonable juror to consider the works as a whole substantially similar.

The Registered Work depicts a scene in which a Chinese boy named "Tzu-Shuang" is

37

sucking his pacifier while "sailing on the Yangtze River, as he listens to ancient Chinese stories from his Grandfather." (Lewinson I, *supra*, at 13.) The Katz Work includes a two-page spread that illustrates, on the right-hand page, a full-page portrait of a Chinese girl named in the text as "May." (Katz, *supra*, at 17-18.) The left-hand page depicts "May" painting with a paintbrush as she sits on a picnic blanket on the bank of a river. (*Id.*) Seated around "May" on the picnic blanket are a boy reading a book and a gray-haired woman holding a sleeping infant. (*Id.*) The differences between these two scenes are significant:

- the focus of the Registered Work is a boy, while the focus of the Katz Work is a girl;

- the Registered Work depicts "Tzu-Shuang" sailing with his grandfather, while the Katz Work depicts "May" painting while sitting on a picnic blanket next to a boy who is reading a book and an elderly woman who is holding a baby;

- the Registered Work proposes to illustrate "Tzu-Shuang" sucking a pacifier, while none of the figures in the Katz Work suck a pacifier;

- the Registered Work describes the boy's grandfather telling him stories, while there is no such description in the Katz Work; and

- the Registered Work gives no description of what will be illustrated in the background, while the Katz Work includes a background scene that includes ducks wandering along the riverbank, rafts and boats sailing down the river, children walking along the opposite river bank toward a pagoda, and yellow mountains in the distance.

(Lewinson I, *supra*, at 13; Katz, *supra*, at 17-18.) In contrast, the only similarities between the two scenes are the setting in or around a river, and the depiction of a Chinese child with an elderly person. (Lewinson I, *supra*, at 13; Katz, *supra*, at 17-18.)

The scenes that Plaintiff alleges depict children getting ready for school share even fewer similarities. In the Registered Work, a girl from Hungary named "Andrea" is depicted sucking

her pacifier "while her Mother brushes her long hair to get her ready for school." (Lewinson I, *supra*, at 2.) The Katz Work, in contrast, illustrates a freckled, pig-tailed girl from America named "Emily" waving as she carries a "Compositions" notebook, with a cityscape in the backdrop. (Katz, *supra*, at 5-6.) Unlike the Registered Work, the Katz Work does not depict a mother, a girl sucking a pacifier, a girl with long hair, a girl in Hungary, or hair being brushed. (*Id*.) While "Andrea" is getting ready for school (Lewinson I, *supra*, at 2), "Emily" is depicted either on her way to or on the way home from school (Katz, *supra*, at 5-6). It is also reasonably inferrable that the Katz Work's "Emily" is an older child than the Registered Work's "Andrea," because "Emily" carries a "Compositions" notebook, suggesting that she is older than a pre-school aged child, which is the oldest age around which the reasonable observer would expect to see a child using a pacifier. (*Id*.) The only similarity between these two scenes is that each depicts a girl in a situation tangentially related to school. (*Id*.; Lewinson I, *supra*, at 2.)

Thus, while the dissimilarities between these scenes are many, the similarities between these scenes are at most de minimis, and more is required to meet the substantial similarity requirement. *See Tufenkian Import/Export Ventures, Inc.*, 338 F.3d at 131 (explaining that the amount copied must be more than de minimis to show substantial similarity); *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, 590 F. Supp. 2d 625, 633 (S.D.N.Y. 2008) (finding no substantial similarity where the elements that were similar were not protectable elements and/or where the allegedly infringing work only made de minimis use of the copyrighted work). In short, these "random [and de minimis] similarities scattered throughout the works . . . cannot [by themselves] support a finding of substantial similarity." *Williams*, 84 F.3d at 590.

Furthermore, the similar illustration on the last pages of the works – both of which show

a dove flying over a global map on which the children depicted in the work are scattered – is an unprotectable scène à faire that naturally flows from the works' similar themes. *See id*. at 589 (works' shared depictions of "dinosaur zoo or adventure park, with electrified fences, automated tours, dinosaur nurseries, and uniformed workers" were "classic sc[è]nes [à] faire that flow from the uncopyrightable concept of a dinosaur zoo"); *Reyher*, 533 F.2d at 91 (explaining that where two works have similar or identical themes, they will employ the same unprotectable scènes à faire). Both the image of a dove and the image of children standing on a globe are common illustrations used to represent unity and peace. (*See* Defs.' Exs. J (Todd Parr, *The Peace Book* (Little, Brown, and Co.) (1st ed. 2004)), P (compiling numerous images of children and doves depicted on or around a globe), and Q (compiling numerous images of doves depicted flying on or around a globe).) Indeed, these images are so common as to be cliché, and it is doubtful that such a clichéd image satisfies the minimum level of creativity necessary to qualify for copyright protection. *See Salinger*, 811 F.2d at 98 ("[A] cliché . . . will frequently fail to demonstrate even the minimum level of creativity necessary for copyright protection."); *Reyher*, 533 F.2d at 91 (noting that "expression in more or less stereotyped form" is not protectable).

<u>iv.  Characters</u>

There are no protectable similarities between the characters depicted in the Registered Work and those depicted in the Katz Work. As Judge Learned Hand observed, "the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly." *Nichols*, 45 F.2d at 121. This principle is applicable here because the characters that appear in the Registered Work are stock examples of children from different countries. None of the characters is discussed on more than one page of the work, and

40

the characters' personality traits are undeveloped.  The use of such indistinct stock characters

does not warrant copyright protection.  *See id.* (concluding that depiction of two young lovers

was "so faintly indicated" that they were not characters protected by copyright); *Williams*, 84

F.3d at 590 (noting that characters in plaintiff's work were too undeveloped to receive copyright

protection); *Robinson*, 1995 WL 417076, at *9 (concluding that characters were not protectable

where the copyrighted work presented no "character development beyond introducing characters

clearly derived from a long line of family-based sitcoms").

### v.  Setting

There are also no protected similarities in the works' settings that give rise to a finding of

substantial similarity.  While both works depict scenes in the United States, Australia, Mexico,

Russia, Japan, and China, it is to be expected that two works about children from around the

world will share some overlap in the countries they depict, especially some of the largest and

most populated countries in the world.  (*See* Defs.' Exs. E (Barnabas Kindersley & Anabel

Kindersley, *Children Just Like Me* (DK Publishing) (1st ed. 1995)) (showing scenes of children

from Hungary, Russia, Japan, China, and Australia), I (Donata Montanari, *Children Around the

World* (Kids Can Press) (2001)) (depicting scenes of children in the United States, Mexico,

Japan, Australia, and China).)  These similarities are therefore unprotectable scènes à faire that

naturally flow from the similar themes of the works.  *See Cavalier*, 297 F.3d at 824 (holding that

works' setting in the "night sky . . . naturally and necessarily flows from the basic plot premise of

a child's journey through the night sky; therefore, the night sky setting constitutes a [scène à

faire] and cannot support a finding of substantial similarity"); *Williams*, 84 F.3d at 589 ("While

both . . . works share a setting of a dinosaur zoo or adventure park, with electrified fences,

automated tours, dinosaur nurseries, and uniformed workers, these settings are classic sc[è]nes [à] faire that flow from the uncopyrightable concept of a dinosaur zoo.  Thus, though perhaps substantially similar, the settings are not protectible.").[9]

### vi.  Sequence

The two works are also dissimilar in their sequence.  Whereas the Registered Work launches directly into scenes depicting children from various countries, the Katz Work includes an introductory two-page spread that explains the concept of United Nations Peace Day and introduces the idea that children around the world say peace in different ways.  (Katz, *supra*, at 1-2.)  The Registered Work depicts thirteen scenes in the following countries in the following order:  Mexico, Hungary, the United States, Sweden, Germany, Israel, the Congo, Australia, Ireland, Russia, Japan, Saudi Arabia, and China.  (Lewinson I, *supra*, at 1-13.)  The Katz Work includes eleven two-page spreads depicting scenes in eleven countries in a different sequence than the Registered Work:  India, America, Japan, Australia, Mexico, Iran, Russia, China, France, Ghana, and Bolivia.  (Katz, *supra*, at 3-22.)  Also, unlike the Registered Work, the Katz Work's illustration of the globe does not appear on the page immediately following the scenes of children in different countries.  (Lewinson I, *supra*, at 1-14; Katz, *supra*, at 3-27.)  Rather, the two pages immediately following the scenes from the eleven countries show four illustrations centered around the theme that children all around the world desire peace (i.e., children going to

---

[9] Plaintiff also argues that the two works similarly depict the setting of the scenes in China because both scenes are set in or around a river.  (Pl.'s Opp'n 10.)  As previously discussed, this minimal similarity, particularly given the many dissimilarities in the two scenes, cannot support the conclusion that the works as a whole are substantially similar.  *See Williams*, 84 F.3d at 590 ("[R]andom similarities scattered throughout the works . . . cannot [by themselves] support a finding of substantial similarity . . . .").

42

school, children walking along a sidewalk, children playing outside, and children eating with their family).  (Katz, *supra*, at 23-24.)  The next two pages of the Katz Work asks, at the top of the left page, "Can You Say Peace?," and both pages show the faces of all the children depicted in the work together, saying "peace" in their own language.  (*Id*. at 25-26.)  The final page of the Katz Work, like the Registered Work, includes the illustration of the dove and the globe populated with the children depicted in the work.  (*Id*. at 27.)  Underneath the illustration of the globe, the Katz Work explains the concept behind the International Day of Peace and provides a list of other countries around the world, their words for peace, and a guide to pronunciation.  (*Id*.)  In contrast, in the Registered Work, the text accompanying the illustration of the globe asks "What Do You Call It?" above the globe, shows children sucking their pacifiers on the globe, and states "Paci on Earth" below the globe.  (Lewinson I, *supra*, at 14.)

Thus, the only similarities in the sequence of the two works are that (1) several pages of both works are dedicated to scenes of children from various countries, (2) near the end of both works, the works ask the reader to state his or her word for "pacifier" or "peace," and (3) both works end with an illustration of a dove flying above a globe populated by children from within the work.  However, as discussed above, none of these is a protectable similarity.  *See supra* Sections II.C.2.c.iii (depiction of discrete scenes of children engaged in activities in various countries is a standard and unprotectable method of conveying the works' shared theme that children around the world share certain things in common); II.C.2.c.i ("Can You Say It?" is an unprotectable phrase and, in any event, is not similar to "What Do You Call It?"); II.C.2.c.iii (illustration of dove flying over globe populated by children is an unprotectable scène à faire).

43

<u>vii.  Pace</u>

While the repetitive pace of the two works is arguably similar, a repetitive format is to be expected in works aimed at children.  *See Robinson*, 1995 WL 417076, at *11 (explaining that where the "pace of the two works [wa]s common to virtually all sitcoms," it was "not a protectable element of Plaintiffs' work"); *Madrid*, 209 F. Supp. 2d at 1241 ("To the extent that Plaintiff's poem even contains 'tone' or 'pace' – for example, the excitement, innocence, or the simplicity of a moment – these elements are certainly not original, but are common to many pieces of children's literary works.").  In any event, similarity in "pace, without more, does not create an issue of overall substantial similarity between the works."  *Williams*, 84 F.3d at 590.[10]

<u>viii.  Total Concept and Feel</u>

Plaintiff argues that the works are substantially similar in their total concept and feel.  As the Second Circuit noted in *Williams*, "[c]onsideration of the total concept and feel of a work . . . is especially appropriate in an infringement action involving children's works."  *Id*. at 589.  In considering similarities between two works' total concept and feel, the Court is mindful that "[a]ccepting an overly broad scope for protectable total concept and feel threatens the basic

---

[10] The Court notes that the pace between the two works also is arguably different.  In the Registered Work, Plaintiff tells vignettes about each child (who is using a pacifier).  For example:

> Page 2:  Andrea, from Hung[a]ry, sucks her "Tzumi" while her Mother brushes her long hair to get her ready for school.

> Page 6:  Meanwhile, Irit, who lives in Israel, can't wait to get home from day care to pop "moe-tzaytz" into her mouth.

(Lewinson I, *supra*, at 2, 6.)  In contrast, the Katz Work consistently follows a simpler pace:  X is from Country Y.  X says the native word for peace.  (Katz, *supra*, at 3-24.)  The Katz reader is told nothing else about each child.

principal of copyright law:  that concepts and ideas may not be copyrighted, and that only a particular expression of an idea may be copyrighted."  *Robinson*, 1995 WL 417076, at *9 (quoting *CK Co*., 1994 WL 533253 at *4).

Here, the reasonable observer could not conclude that these works are substantially similar in their total concept and feel.  While the themes of the two works are arguably similar, the works do not similarly express their theme.  The Katz Work focuses on the International Day of Peace as a means through which to convey the idea that children around the world, despite their differences, share their desire for peace.  The Registered Work is not connected in any way to the International Day of Peace.  Likewise, as discussed above, while the pacifier is a metaphor central to the Registered Work (and, indeed, that appears on every page of the Registered Work), the Katz Work does not address or include any text or illustrations that refer to pacifiers.[11]

Relatedly, the Katz Work also conveys its message more directly than the Registered Work.  The introductory explanation of "Peace Day" explicitly references the work's theme that "[c]hildren everywhere will wish for peace, hope for peace, and ask for peace" and that children in different countries say the word "peace" differently.  (Katz, *supra*, at 1-2.)  The Katz Work also includes a two-page spread that directly conveys the work's message:  "[a]ll around the world, children want to go to school, to walk in their towns and cities, to play outside, and to share food with their families.  They want to do all these things and feel safe.  No matter how we say it, we all want peace."  (*Id*. at 23-24.)  In contrast, the Registered Work is considerably more nuanced in conveying its theme.  The Registered Work does not once refer to the word "peace," relying instead on "the metaphor of a pacifier and the children's names for it all around the

---

[11] The same is true of the Unregistered Manuscript.

globe" to convey the "message that children worldwide desire peace."  (Pl.'s Opp'n 5; Lewinson

I, *supra*, at 1-14.)

The tone of the Katz Work also is more instructional than that of the Registered Work.

The instructional tone of the Katz Work is conveyed in its introductory explanation of "Peace

Day," as well as the explanation on the final page of the work about the United Nations

International Day of Peace.  (Katz, *supra*, at 1-2, 27.)  Each two-page spread also provides the

translation for "peace" in a short, instructive manner (e.g., "Claire lives in France.  Claire says

*paix* (pay).").  (Katz, *supra*, at 3-22.)  The Registered Work conveys a more descriptive, and less

instructive, tone than the Katz Work.  For example, the Registered Work does not include any

directly instructive passages.  (Lewinson I, *supra*, at 1-14.)  Rather, the Registered Work

provides the translation for the word "pacifier" within the text describing each scene (e.g., "In

Ireland, pretty little Caitlin is soothed by her 'soother' while her Mother reads her bedtime

stories.").  (*Id*. at 9.)

Although both works convey a similar, upbeat mood through the depictions of happy

children engaged in play activities throughout the world, an upbeat mood is to be expected from

works geared toward children, let alone children's works involving the theme of peace (indeed,

who would write a book discussing children's desire for war?).  In short, to the extent that the

works are similar in their total concept and feel, these similarities stem from the fact that both

works are aimed at a young audience, and convey the same general idea through depictions of

discrete scenes of children in various countries stating the same word in a different language.

This does not make out a viable case of copyright infringement.  *See Hudson*, 2008 WL 4701488,

at *4 (concluding that where "similarities [are] only in the ideas the works seek to represent, and

46

thus are not protectable elements of artistic expression . . . [t]here is no substantial similarity in the total concept and feel, theme, setting, or plot"). Particularly in light of the many differences between the works, no reasonable observer could conclude that these works are substantially similar. *See Williams*, 84 F.3d at 590 ("[The] claim fails here largely because the similar parts of the parties' works are unprotectible sc[è]nes à faire or trivial, scattered details."); *Hudson*, 2008 WL 4701488, at *7 ("[Where similar] elements are unprotectable facts and ideas and/or sc[è]nes à faire, and a close inspection of the elements shows no similarity in how these ideas are expressed . . . . there is no substantial similarity between the two works as a matter of law . . . ."). Summary judgment for Defendants is therefore granted.

### III.  Conclusion

For the reasons discussed above, Defendants' motion for summary judgment is granted. The Clerk of Court is respectfully directed to enter judgment for Defendants, terminate the pending motion (Dkt. No. 18), and close the case.

SO ORDERED.

Dated:       September **2)** , 2009
             White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

47

Service List (By ECF)

Zev Lewinson
1415 Queen Anne Road
Teaneck, New Jersey 07666
Tel:  (845) 300-6127
Fax: (201) 221-7743
Pro Se

Robert D. Balin, Esq.
Christoper J. Robinson, Esq.
Davis Wright Tremaine, LLP
1633 Broadway
New York, New York 10019-6708
Tel:  (212) 489-8230
Fax: (212) 489-8340
*Counsel for Defendants*